**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**IRON TAX, ACCOUNTING &
FINANCIAL SOLUTIONS, LLC**                                    **PLAINTIFF**

**V.**                          **CASE NO. 5:23-CV-5243**

**STORY LAW FIRM, P.L.L.C.;
and TRAVIS W. STORY**                                        **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Iron Tax, Accounting & Financial Solutions, LLC ("Iron Tax") brought this suit against Defendants Story Law Firm, PLLC and Travis W. Story (collectively, "Defendants" or "Story") for legal malpractice. The claims here arise out of an underlying suit that resulted in a default judgment being entered against Iron Tax for failing to timely file a responsive pleading. The Court now takes up four motions filed by Defendants, and, having reviewed all accompanying briefing and record citations, it holds the following:

- Defendants' Motion for Summary Judgment (Doc. 24) is **DENIED**;

- Defendants' Motion to Exclude And/Or Limit Expert Testimony of Danny Crabtree (Doc. 27) is **GRANTED IN PART AND DENIED IN PART**;

- Defendants' Motion in Limine to Exclude Damages Regarding Reputational Harm and Loss of Business Opportunities (Doc. 36) is **MOOT**; and

- Defendants' Motion in Limine to Exclude Plaintiff from Arguing for Punitive Damages (Doc. 38) is **MOOT**.

### I.  BACKGROUND

### A.  The Underlying Suit

On June 29, 2021, Iron Tax and Roger McCloud, its founder and CEO, agreed to purchase Bottom Line Bookkeeping & Tax Services from Cynthia and Charles Tripp. (Doc. 35, ¶ 1; Doc. 33-3, p. 5). The parties entered into a Purchase and Sale Agreement and

1

agreed to a total purchase price of $130,000.00. (Doc. 35, ¶ 2). Iron Tax paid an earnest money deposit of $6,000.00 and executed and delivered a Promissory Note to the Tripps for the remaining amount. *Id*. at ¶¶ 2, 4. Under the Note, Iron Tax would make payments of $5,000.00 on August 1, September 1, and October 1, 2021, and the remainder would be paid over a sixty-month period with interest. *Id*. at ¶¶ 5, 6. Iron Tax would be in default if payment was not made within ten days after it was due. *Id*. at ¶ 7.

The Purchase Agreement was contingent on the satisfaction of a thirty-day due diligence period. (Doc. 25-1, p. 2). During this time, "[Ms. Tripp] agree[d] to provide [Iron Tax] any requested contingency information within 5 days of request date[,] and [Iron Tax] agree[d] to review and approve or disapprove the information provided within 5 days of receipt." *Id*. Within the thirty-day period, Iron Tax had the right to cancel the contract. *Id*. This contingency would be removed thirty days after ratifying the Agreement. *Id*.

The Purchase Agreement also contemplated Ms. Tripp continuing to work at Bottom Line indefinitely to aid in the transition, and it contained the following noncompete:

> Upon termination as an employee of [Iron Tax], [Ms. Tripp] agrees not to own or manage a similar type of business within a 60 mile radius of [Iron Tax] for a period of 2 years. [Ms. Tripp] agrees not to consult with, be contracted by, or be employed by any company similar within a 60 mile radius of [Iron Tax] for a period of 2 years from termination.

(Doc. 25-1, p. 3).

The parties dispute whether Ms. Tripp, and the broker she worked with, provided the requested documentation to Mr. McCloud. Mr. McCloud testified that he reviewed the documents on the computer with Ms. Tripp prior to signing the Purchase Agreement, but Ms. Tripp failed to provide actual copies of the records when requested later in the due diligence period. (Doc. 33-3, pp. 16–18). There is no evidence that Mr. McCloud raised

2

any complaints during the due diligence period about the provision of records. Mr. McCloud did explain in his deposition, however, that when Ms. Tripp showed him the documents regarding gross revenue, she represented that the records were "only for the bookkeeping business and only indicated money for the bookkeeping business," when— allegedly—it included revenue beyond the bookkeeping business. (Doc. 33-3, p. 15).[1]

Ms. Tripp worked at Iron Tax for several weeks following the purchase. Eventually, she and Mr. McCloud had a falling out, and she left. (Doc. 35, ¶ 23). Following her departure from Iron Tax, Ms. Tripp provided some services for Plaza Technology—a former client and neighbor of Bottom Line Bookkeeping. Plaza Technology was a computer sales company owned by Ms. Tripp's longtime friend. (Doc. 33-7, pp. 67–68). Ms. Tripp testified that she would help out at Plaza by answering calls, clearing desks, sorting mail, and talking to people who came in. (Doc. 25-3, pp. 17–18). Ms. Tripp also testified that she would look at Plaza's Quickbooks to check if the Plaza's new third-party bookkeeper was completing the work, whether it was being done correctly, and the last-worked-on date. Doc. 33-7, p. 62; *see also id.* at pp. 143–44 (Ms. Tripp testifying that it did not look like the new bookkeeper was completing her work, but Ms. Tripp did not "do

---

[1] The Court notes that Mr. McCloud also testified that he did not ask Ms. Tripp whether this revenue included other entities and he only looked at the first page of the tax return, without further investigating the tax return to see whether any of the revenue came from other properties or entities. (Doc. 33-3, p. 15). Additionally, Mr. McCloud's basis for believing that Ms. Tripp's representation of the gross revenue for the bookkeeping business was inflated stems from the fact that Iron Tax made 95% less than what Ms. Tripp represented she had made in prior years. *Id*. Defendants tie this loss of revenue to loss in clientele following the purchase, pointing to testimony of Iron Tax's CFO and Director of Accounting that Bottom Line Bookkeeping lost approximately 30–40% of its clients soon after Iron Tax purchased the business. (Doc. 25-5, p. 2).

anything for them on that"). Ms. Tripp testified that she could not remember whether she was paid for this work. (Doc. 33-7, p. 61).

Following the due diligence period, Iron Tax made the August 1 and September 1 payments; it also attempted to make the October 1 payment, but the check bounced. (Doc. 35, ¶¶ 8, 9). Around that time, Iron Tax contacted Travis Story and Story Law Firm, seeking representation, as Plaintiff wanted to rescind the Purchase Agreement.

### B. The Alleged Malpractice

On October 14, 2021, Defendants sent Iron Tax an Engagement Letter (Doc. 33-5). The Engagement Letter stated that Iron Tax had "requested the Story Law Firm, PLLC [ ] to represent [it] in an **Iron Tax v. Cynthia Tripp** ('Matter')." *Id.* at p. 1. It further explained that "unless and until [Defendants] receive a fully executed copy of this engagement letter along with the requested retainer set forth below, [they] shall not be considered or deemed to be [Iron Tax's] counsel and will not commence work or have any obligation to commence work on [Iron Tax's] behalf." *Id.* The Engagement Letter also stated that the "offer of representation will be void after ten (10) days, if this agreement is not fully signed and returned and if the Retainer is not paid by secured funds." *Id.* at p. 6.

Despite this language, Defendants proceeded to send a Demand Letter (Doc. 33-6) to the Tripps that same day, before Mr. McCloud executed the Engagement Letter or paid the $3,000 retainer. In the Demand Letter, Mr. Story wrote: "My firm represents Iron Tax . . . and my client has authorized me to assist in recission of the contract signed by my Clients Iron Tax and [the Tripps] for the purchase of Bottom Line Bookkeeping & Tax Services [ ]." *Id.* at p. 1. The letter further asserted that there had been misrepresentations and fraud that affected the valuation of the business. *Id.* Iron Tax demanded the return of

4

the $16,653.00 (i.e., the earnest money and August and September payments), indemnification for all warranty work performed by Iron Tax, and all operating expenses of the business until recission was completed. *Id.* The letter also explained that Iron Tax's October payment and all future payments would be held in escrow until the matter was resolved. *Id.* According to Mr. McCloud, Mr. Story had advised Iron Tax to stop making the payments, and when Mr. McCloud expressed concern that the Tripps might sue, Mr. Story stated he would "handle it when it comes to that, but we're going to file a lawsuit before they do." (Doc. 33-3, p. 31). On October 20, Mr. McCloud emailed Mr. Story that he believed Ms. Tripp was violating the noncompete provision of the Purchase Agreement; Mr. Story replied asking Mr. McCloud to provide whatever documentation he had and that he would let him know if they needed anything from Ms. Tripp or her attorney. (Doc. 25-10, pp. 1–2).

On October 26, Mr. McCloud signed the Engagement Letter. *See* Doc. 33-5, p. 6. Then, on November 15, the Tripps' attorney sent Defendants a letter declining Iron Tax's demand and making their own demand for the outstanding payments. (Doc. 25-11). In that letter, the Tripps' attorney stated to Mr. Story, "I understand that you represent Iron Tax." *Id.* at p. 3. It seems that during this time there was some confusion between Mr. Story and Mr. McCloud as to whether additional documents were needed before Mr. Story could draft and file a complaint against the Tripps. (Doc. 35, ¶ 36).

In early January 2022, Mr. McCloud reached out to Story Law Firm to inquire whether his check for the $3,000.00 retainer had been received. (Doc. 33-3, pp. 41–42). On January 21, 2022, Mr. McCloud called Story Law Firm to inform them that the Tripps

had filed suit against Iron Tax. One of the firm's legal assistants recounted this phone call

in an email to Mr. Story that same day:

> Travis,
>
> Roger McCloud from Iron Tax called in saying that they just got served by [Ms. Tripp] and they were not notified and he plans on sending the documentation over to you. Once he send's [sic] that over, he would like to speak with you on a timeline and next steps. He also asked if we received the check yet for his retainer fee of $3,000.00 after he signed his Engagement Ltr. but we have still not received it yet in the mail. I think there is an issue with the postal service on their side. So he does plan on going on ahead and paying with a Credit Card. He has to get his business credit card from his boss before he can pay. I will process his retainer payment in Law Pay once he calls back and then we can move forward with his matter when we are able to.

(Doc. 33-9, p. 1).

About an hour later, Mr. McCloud forwarded to Mr. Story his response to the Tripps'

attorney, in which he confirmed receipt of the summons, notified the attorney that Iron Tax

had "also obtained additional council [sic] with Travis Story at Story Law in Fayetteville,

AR," and provided Mr. Story's contact information. (Doc. 25-12, p. 2). Later that afternoon,

Mr. Story emailed Mr. McCloud stating the following:

> Roger,
>
> What is interesting is [the Tripps] switched attorneys, I had been trying to deal with another person, so I am not sure what happened here. When were you served?
>
> What we need to do is file an answer and counterclaim within the 30 days from when you were served.
>
> Do you have some time next week and we can do a quick call to make sure we are all still on the same page as far as what our counterclaims are, and then update any numbers we have and we can move forward.

(Doc. 25-12, p. 1). Mr. McCloud responded a few minutes later saying he was served

earlier that day (January 21). *Id.*

6

Sometime in the next week or so, Mr. Story and Mr. McCloud spoke on the phone. According to Mr. Story, he said something to the effect of "we need to get the payment made so that we can—so that we can answer this and go forward." (Doc. 33-4, p. 76). Mr. Story viewed "the ball" as being in Mr. McCloud's court at that point. *Id.* at p. 77. Per Mr. McCloud's testimony, however, Mr. Story told Mr. McCloud that he had "it all under control":

> [Mr. McCloud:] . . . We had a phone conversation. So that [ ] would have been we had one [sic] that following week where we talked on the phone and he said, I've got it all under control. We'll get it going.
>
> Q: Okay. So just to make sure that I understand, he sends you this e-mail the next week. So that would [have] been either late January, early February depending on the day, you had a phone conversation with Mr. Story; is that right?
>
> A: Yes.
>
> Q: And what do you remember him telling you in that conversation?
>
> A: We talked about what would happen. He said we're going to go to court, I'm going to file answers, we're going to file a counterclaim. . . . I mean, my understanding was, I've got everything under control, there's nothing you need to worry about.
>
> Q: Okay. Did anything come up about the retainer in that conversation?
>
> A: At that moment I said, Hey, we still need to pay the retainer. And he said, Yeah, I'll get the invoice to you. And I was like, Can we pay online? He's like, Yes, I'll send you the invoice. You pay the invoice. I said, Can we bring a check, and it was the same thing, well, you'll just have to get with my assistant, and then it's like his assistant was giving me the runaround.

(Doc. 33-3, p. 41).

When Mr. Story was asked whether he specifically told Mr. McCloud on the phone that he did not represent him and would not be answering the lawsuit until the retainer was paid, Mr. Story replied, "I don't think I would say it that—that way on the phone." (Doc.

33-4, p. 76). He then went on to explain that he "hate[s] dealing with the money issues and sometimes that's—that's the problem" and that "part of the problem is internally [his firm] do[es]n't set up a file . . . until we've been engaged on that price—on that project," which includes inputting deadlines and calendar dates. (Doc. 33-4, pp. 76–78). Mr. Story testified that he "heard there were issues paying," and he asked his assistant "a couple times has that been paid or do we have a matter for that yet." *Id.* at 77. It appears Defendants never sent him an invoice. *See* Doc. 33-3, p. 42 (Mr. McCloud stating he never received a bill or a follow up from the firm).

Mr. Story testified that he had everything he needed to file an answer as of January 21, he just needed additional documentation for drafting the counterclaim (Doc. 33-4, pp. 85–86). On February 25, after the 30-day window to file an answer had run, Mr. McCloud emailed Mr. Story: "Where are we at with this did we respond," and he again asked for a bill for services and for the legal assistant to call them so Iron Tax could make the $3,000.00 retainer payment. (Doc. 33-8, p. 1). Mr. Story filed the answer on March 4. (Doc. 35, ¶ 46).

On March 22, the Tripps filed a motion for default judgment, and a default judgment was entered against Iron Tax on April 18. (Doc. 35, ¶ 47). The Tripps then filed an action in Tulsa County District Court in Oklahoma to collect on the default judgment. (Doc. 35, ¶ 48). Iron Tax settled the action with the Tripps for $113,899.62. (Doc. 35, ¶ 49).

As of April 5, 2022, Iron Tax still had not paid Defendants the retainer. *See* Doc. 33-9, p. 3 (internal email at Story Law Firm explaining that they still had not received McCloud's check and that McCloud had not called to pay over the phone and also noting

that although McCloud signed the Engagement Letter in October, the signed copy had not been entered into their system).

In December 2023, Iron Tax filed this suit against Defendants for negligence and breach of contract. Defendants now move for summary judgment on both counts. Additionally, Defendants have filed a *Daubert* motion and two motions in limine.

## II.  Motion for Summary Judgment (Doc. 24)

Under Federal Rule of Civil Procedure 56(a), "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving

party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 248).

Defendants argue that Plaintiff's negligence and breach of contract claims should be dismissed as a matter of law. First, Defendants argue that they did not owe a duty to Plaintiff under theories of negligence or contract because an attorney-client relationship never existed between the parties. Second, Defendants argue that even if such a relationship existed, Plaintiff is unable to prove that Defendants' action or inaction caused Plaintiff's damages.

### A. Attorney-Client Relationship

Defendants first contend that they did not have an attorney-client relationship with Iron Tax because (a) the engagement letter only contemplated sending the demand letter, which they did, and (b) Iron Tax never paid the retainer. The Court is unpersuaded on both fronts.

"Generally, the rules of agency apply to the attorney-client relationship." *Sw. Energy Co. v. Eickenhorst*, 955 F. Supp. 1078, 1086 (W.D. Ark. 1997), *aff'd*, 175 F.3d 1025 (8th Cir. 1999) (citing *Peterson v. Worthen Bank & Trust Co.*, 296 Ark. 201, 204 (1988)). In Arkansas, "the relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act." *Evans v. White*, 284 Ark. 376, 378 (1985) (citing Second Restatement of the Law of Agency § 1, cmt. a). Apparent, or implied, authority is that which "the principal knowingly permits the agent to assume, or that [the principal] holds the agent out as possessing; such authority as he appears to have by reason of the

actual authority that he has; or such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Foundation Telecomms., Inc. v. Moe Studio, Inc.*, 341 Ark. 231, 237 (2000). The party asserting the agency relationship bears the burden of proving its existence. *Courtyard Gardens Health & Rehab., LLC v. Quarles*, 2013 Ark. 228, at *7 (2013).

Here, the parties had an executed engagement letter that, arguably, manifested both parties' consent to an attorney-client relationship. The engagement letter defined its scope as dealing with the "Matter" of *Iron Tax v. Tripp*; it did not further narrow its scope to the demand letter alone. (Doc. 33-5, p. 1). In fact, there is evidence that both Iron Tax and Mr. Story anticipated filing a lawsuit against the Tripps. (Doc. 35, ¶ 36). Defendants argue that because this malpractice suit revolves around *Tripp v. Iron Tax*—rather than *Iron Tax v. Tripp*—it was not contemplated by the engagement letter. But the Court is not persuaded that Defendants had no duty to represent Iron Tax as a matter of law merely because Ms. Tripp beat Iron Tax to the punch in filing suit, particularly when the Tripps' suit sought recovery of funds that they had demanded in the November 15 letter to Mr. Story and that Iron Tax had withheld as a part of its demand sent by Mr. Story.

Regardless of the engagement letter's language, there is a question of fact whether the parties had an implied agency relationship. It is undisputed that Mr. Story sent the demand letter prior to receiving the signed engagement letter or retainer. There is also evidence Mr. Story was aware that Iron Tax had sent a check for the retainer and was trying to make sure payment went through, (Doc. 33-3, pp. 41–42; Doc. 33-9, p. 1), and that he was aware Mr. McCloud had represented to the Tripps' counsel that he was

representing Iron Tax, (Doc. 25-12, p. 2). Defendants have not pointed to any evidence that, when Mr. Story received the Tripps' November 15 demand letter that stated, "I understand you represent Iron Tax," he did anything to rebut that understanding. *See* Doc. 25-11. It is undisputed that Iron Tax and Mr. Story had communicated about the Tripps' lawsuit. *See* Doc. 25-12, p. 1. And most importantly, there is evidence that, sometime after the January 21 email, Mr. Story told Mr. McCloud, "I've got it all under control. We'll get it going" and "I'm going to file answers, we're going to file a counterclaim." (Doc. 33-3, p. 41). According to Mr. McCloud, when he inquired about the outstanding payment, Mr. Story stated he would send the invoice, but Mr. McCloud never received the invoice and was "giv[en] [ ] the runaround" by Mr. Story's assistant when attempting to pay. *Id.* And even without the retainer, Mr. Story still filed an answer on March 4. Doc. 35, ¶ 46; *see* Doc. 33-9, p. 3. Viewing the evidence in the light most favorable to Iron Tax, the Court cannot say as a matter of law that there was no implicit agency relationship.

"The essential element of an attorney-client relationship is the engagement or consultation of a lawyer by a client for the purpose of obtaining legal services or advice." *Heathcoat v. Santa Fe Int'l Corp.*, 532 F. Supp. 961, 964 (E.D. Ark. 1982) (citing *Diversified Indus., Inc., v. Meredith*, 572 F.2d 596 (8th Cir. 1977)). Here, the Court finds there is a genuine issue of material fact whether Mr. Story and Iron Tax had an attorney-client relationship at the time in question.

### B. Causation

To the extent there was an attorney-client relationship, Defendants argue that any breach in the standard of care did not proximately cause Iron Tax's damages. The Court finds there is a genuine issue of material fact here as well.

To "prevail under a claim of legal malpractice, a plaintiff must prove that the attorney's conduct fell below the generally accepted standard of practice and that this conduct proximately caused the plaintiff damages." *S. Farm Bureau Cas. Ins. Co. v. Daggett*, 354 Ark. 112, 122 (2003) (citation omitted). A plaintiff must show damages and proximate cause by showing that "but for the alleged negligence of the attorney, the result in the underlying action would have been different." *Id.* (citing, *inter alia*, Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 30.44, at 614 (5th ed. 2000): "At a minimum, the client must allege that the judgment would have been appealed . . . and would have been reversed but for the attorney's negligence."). This typically involves looking at the "case within the case[ ] because the legal malpractice plaintiff must establish how the attorney's negligence in the underlying litigation proximately caused the legal malpractice plaintiff's damages." *Young v. Blake*, 2022 Ark. App. 378, *8 (Ark. Ct. App. 2022) (citing *Mack v. Sutter*, 366 Ark. 1, 5 (2006); *Daggett*, 354 Ark. at 122). "An attorney is negligent if he or she fails to exercise reasonable diligence and skill on behalf of his or her client." *Daggett*, 354 Ark. at 122.

The parties' dispute here revolves around whether Iron Tax had a valid argument that Ms. Tripp fraudulently misrepresented the state of her bookkeeping business when she sold it and whether Ms. Tripp violated the noncompete provision of the Purchase Agreement.

Fraudulent misrepresentation would require a showing that Ms. Tripp: (1) made a false representation of facts; (2) with knowledge of the falsity or knowledge of insufficient evidence to make the representation; (3) intending to induce Iron Tax's action, inaction, or reliance on the representation; and that Iron Tax (4) justifiably relied on the representation and (5) suffered damage as a result. *Rosser v. Columbia Mut. Ins. Co.*, 928 S.W.2d 813, 815 (Ark. Ct. App. 1996) (citing *Wheeler Motor Co. v. Roth*, 315 Ark. 318, 324 (1993)). While there is some dispute as to whether Ms. Tripp provided all the requested information during the due diligence period, it is undisputed that the due diligence period had fully run and the closing date had passed before Iron Tax raised any concerns. There is some evidence, however, that Iron Tax was misled as to the value of the business. Though much of this alleged misunderstanding seems to have stemmed from Iron Tax's greenness when it came to conducting due diligence, Mr. McCloud testified in his deposition that Ms. Tripp affirmatively misrepresented the records she was showing him. (Doc. 33-3, p. 15 (when asked whether "Ms. Tripp ma[d]e any representations to [him] that the records she was showing [him] were only for the bookkeeping business and only indicated money for the bookkeeping business?" Mr. McCloud responded "Yes.")). Viewing this in the light most favorable to Iron Tax, it raises a genuine issue of material fact as to whether Iron Tax could have successfully defended the Tripp lawsuit and pursued its own claims on the theory of fraudulent misrepresentation.

The Purchase Agreement included a noncompete provision that prohibited Ms. Tripp from, among other things, consulting with, being contracted by, or being employed by any company similar within a 60-mile radius of Iron Tax for two years after Ms. Tripp's

termination from Iron Tax. (Doc. 25-1, p. 3). Iron Tax alleges that Ms. Tripp violated the noncompete by serving as a "supervisory bookkeeper" for a previous client, Plaza Technologies. After her time at Iron Tax, Ms. Tripp helped out at Plaza, which was owned by Ms. Tripp's long-time friend, by stopping in to sort mail, clear desks, answer phones, and briefly look at the Quickbooks to see if the new third-party bookkeeper was completing her work. (Doc. 25-3, pp. 17–18, 19, 26). Even viewing this evidence in light most favorable to Iron Tax, it is insufficient to show that Ms. Tripp consulted with, was contracted by, or employed by a "company similar." There is no evidence she conducted any substantive bookkeeping work, and what's more, Plaza is not a "company similar"— it is a computer sales company and did not provide bookkeeping or tax services. (Doc. 33-7, pp. 67–68). The Court finds that Iron Tax could not have succeeded on its defense or claims on a theory of noncompete violation.

Thus, the Court finds there is a genuine issue of material fact whether Story's alleged malpractice caused Plaintiff's damages in having to pay the default judgment.

### C. Damages

Defendants assert that Plaintiff has presented no proof of damages. While the Court finds there is evidence of damages in the form of the amount paid for the default judgment, the Court agrees with Defendants that there is no evidence of reputational harm or loss of business opportunity. While Plaintiff's response maintains that the Defendants' inaction "also caused reputational harm and loss of business opportunities," (Doc. 34, p. 2), and they "believe" it "deterred future clients and affected long-term profitability," *id.* at p. 14, there is no evidence to support this. Thus, the Court finds as a

matter of law that there is insufficient evidence that Defendants caused damages related to reputational harm or loss of business opportunity.

Because the Court finds there are genuine issues of material fact regarding the existence of an attorney-client relationship and whether the alleged malpractice caused damages in the amount of the settled default collection, the Court denies Defendants' Motion for Summary Judgment (Doc. 24).[2]

---

[2] Before concluding its discussion on summary judgment, the Court notes several instances in which Plaintiff's counsel misquoted, misrepresented, and miscited case law.

First, Plaintiff's counsel quoted the Eighth Circuit in *Gerber Prod. Co. v. Mitchell Williams Selig Gates & Woodyard, PLLC*, 28 F.4th 870, 875 (8th Cir. 2022) as saying "An express agreement is not always necessary to establish an attorney-client relationship; rather, it may be implied from the conduct of the parties." *See* Doc. 34, p. 9. This quote does not appear in *Gerber*, nor any case that Defendants' counsel or this Court were able to locate. In fact, the words "express" and "attorney-client relationship" do not appear anywhere in *Gerber*. Additionally, the pincite is not to the majority opinion, which is not indicated in Plaintiff's citation.

Second, Plaintiff's counsel twice cited to *Miller v. Byrne*, 916 P.2d 566 (Ark. 1995). *See* Doc. 34, pp. 11, 13. Of course, the Pacific Reporter does not cover the Arkansas Supreme Court. The accurate citation is *Miller v. Byrne*, 916 P.2d 566 (Colo. App. 1995), meaning *Miller* is not binding authority as Plaintiff's counsel represented.

Third, Plaintiff's counsel cites to *Giles v. Harrington*, 291 Ark. 289, 724 S.W.2d 943 (1987). The correct cite for this case is, in fact, *Giles v. Harrington*, 362 Ark. 338, 208 S.W.3d 197 (2005), which is not even close. As Defendants noted in their brief, 291 Ark. 289 is the reporter cite for an entirely separate case, *Kelley v. Wiggins*, 291 Ark. 280, 724 S.W.2d 443 (Ark. 1987). And 724 S.W.2d 943 cites to a Texas Court of Appeals case, *Bulgerin v. Bulgerin*, 724 S.W.2d 943 (Tex. App. 1987), *abrogated by Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819 (Tex. 1997). Neither *Kelley* nor *Bulgerin* involve legal malpractice.

Quite frankly, short of the misuse of AI, it is unclear how such errors would slip past a reasonably diligent attorney. And, in the context of a legal malpractice suit, such errors are ironically glaring.

### III. Daubert Motion (Doc. 27)

The decision whether to exclude expert testimony is committed to a district court's discretion—subject, of course, to the Federal Rules of Evidence, including Rule 702. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (2014). Rule 702 states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Eighth Circuit has "boiled down" these requirements into a three-part test:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Johnson*, 754 F.3d at 561 (quoting *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008)). The proponent of expert testimony bears the burden of showing by a preponderance of the evidence that these requirements are satisfied. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006).

Having reviewed Mr. Crabtree's qualifications, the Court finds he is qualified to provide his expert opinion on the standard of care in Arkansas, and Defendants do not dispute this. Rather, Defendants challenge the helpfulness and scope of Mr. Crabtree's testimony.

In legal malpractice cases, the jury is called upon to decide, "based on the standard in the legal community as testified to by the expert witness," whether the attorney was negligent, as "measured against the generally accepted standard of practice." *Barnes v. Everett*, 351 Ark. 479, 493–94 (2003). The Arkansas Supreme Court has made clear that "[s]uch a measurement plainly requires expert testimony as to what the standard of practice is, unless the trial court determines that such testimony is not necessary because the case falls within the common-knowledge exception." *Id.* at 494 (citation omitted). In applying a similar exception under Missouri law—that expert testimony is not required "if the negligence in question is 'clear and palpable to a jury of laymen'"—the Eighth Circuit noted that expert testimony was not required where a lawyer failed to file a claim within the statute of limitations or allowed "some other time limit to pass." *Rosemann v. Sigillito*, 785 F.3d 1175, 1180 (8th Cir. 2015) (citing *Zweifel v. Zenge & Smith*, 778 S.W.2d 372, 374 (Mo. Ct. App. 1989)).

Mr. Crabtree's primary opinion is that Mr. Story's failure to timely file a responsive pleading breached the standard of care for an attorney in Arkansas. (Doc. 31-3, p. 1). The Court is not convinced that Mr. Crabtree's testimony on this is *necessary* to the jury's finding because it is common knowledge that failure to comply with statutorily prescribed deadlines in court cases is not in keeping with the standard of care for an attorney. Nevertheless, the Court will permit Mr. Crabtree to testify that an attorney acting within the standard of care would have timely filed the answer, moved for an extension, or given advance warning to a client that they do not represent them in the matter due to

nonpayment.[3] And Mr. Crabtree may explain the effect of failing to answer: that a defendant is precluded from asserting its defenses and counterclaims. The Court believes such testimony could help the jury to better understand the standard of care. Should the parties instead wish to stipulate that failing to answer in thirty days constitutes a breach of the standard of care, they may, of course, do so.

Noting his own hesitation, Mr. Crabtree makes two additional opinions as to causation and the existence of an attorney-client relationship. In his report, Mr. Crabtree notes it is his "belief that Arkansas law does not permit an attorney-expert in a legal malpractice case to render an opinion as to causation (i.e. to testify as to the outcome of the underlying case)." (Doc. 31-1, p. 1). However, he states that to the extent such testimony is permitted, he believes Iron Tax "would have prevailed in the underlying case but for Attorney Story's failure to timely file a responsive pleading" because Iron Tax had "meritorious affirmative defenses and counterclaims" against the Tripps, including a claim for violation of the noncompete. (Doc. 31-3, p. 2). Similarly, in his deposition, Mr. Crabtree states, "While I don't believe, yet again, that a legal malpractice expert should offer testimony as to whether there is client engagement," to the extent such testimony is allowed, he opines that Mr. Story did have an attorney-client relationship with Iron Tax that was not limited to the demand letter. *See* Doc. 27-2, p. 10.

---

[3] Defendants also mention Mr. Crabtree's testimony that Mr. Story had an obligation to tell Iron Tax that he was not filing a responsive pleading unless Iron Tax paid him the retainer. *See* Doc. 28, p. 4. To the extent this opinion relates to the standard of care, the Court finds it could be helpful to a jury. *See* Doc. 31-2, pp. 33–34 (Crabtree testifying: "[I]f you undertake the representation, no matter what your fee agreement says, and you act on behalf of the client," then "even if they haven't paid, you've got an obligation to . . . either file the responsive pleading in time or give notice in writing to the client that you don't represent them.").

Defendants argue that these two opinions are inadmissible as they stray from the appropriate scope of the testimony, i.e., whether Story acted within the standard of care. The Court agrees with Defendants. The Court is not persuaded by Plaintiff's arguments that testimony as to causation in this case would help the jury understand "how different legal strategies would have altered the outcome." (Doc. 32, p. 8). Mr. Crabtree's testimony regarding causation has nothing to do with different legal strategies and is merely an assessment of whether the noncompete violation and fraudulent misrepresentation defenses/counterclaims would have succeeded. This is a determination fully within the jury's capability. And, as to whether an attorney-client relationship existed, the jury will have to make that determination by applying the law—as supplied in the jury instructions—to the facts in this case.

For these reasons, Mr. Crabtree may testify as to the standard of care in this case but may not testify as to causation or the existence of an attorney-client relationship.

### IV. Motions in Limine (Docs. 36 & 38)

Defendants ask the Court to exclude damages regarding reputational harm and loss of business opportunities, *see* Docs. 36 & 37, and to prevent Plaintiff from arguing punitive damages, *see* Docs. 38 & 39. As to the reputational harm and loss of business opportunities, the Court finds this issue moot due to its finding at summary judgment that Plaintiff has produced no evidence to support such damages.[4] *See supra* section II.C.

---

[4] Plaintiff attached two letters to its response to the motion to exclude reputational harm and business opportunity damages. *See* Doc. 42, 43-6, 43-7. These letters are purportedly from Iron Tax's clients cancelling their contracts due to ongoing litigation and garnishment of the client's escrow funds. These letters are not bates stamped, and Defendants reply that they have never seen these letters because—despite multiple requests for evidence to support these damages—Plaintiff's counsel did not produce

The Court also finds the issue of punitive damages moot in light of Plaintiff's response that it does not intend to argue for punitive damages. *See* Doc. 41.

### V. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 24) is **DENIED**; Defendants' Motion to Exclude And/Or Limit Expert Testimony (Doc. 27) is **GRANTED IN PART AND DENIED IN PART**; and Defendants' Motions in Limine (Docs. 36 & 38) are found to be **MOOT**.

IT IS SO ORDERED on this 8th day of April 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

these letters in discovery. *See* Doc. 46. The Court strikes Docs. 43-6 & 43-7 and admonishes Plaintiff's counsel.